## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11-CV-912-NJR-DGW |
| | ) | |
| FRANKIE L. SANDERS and | ) | |
| STATE OF ILLINOIS DEPARTMENT | ) | |
| OF REVENUE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Defendant Frankie Sanders is a self-employed farmer. He has not, however, filed a federal income tax return or paid federal income taxes since at least 1991. In fact, it is unclear if he has ever done so. He is a "tax defier" and believes that he has no obligation to pay income taxes. As many tax protestors before him have learned, adherence to this belief, no matter how sincerely held, is unwise and can be costly.[1] That is the case here. The Government filed this collection lawsuit seeking to satisfy, or at least partially satisfy, Mr. Sanders's tax debt by selling the two farms on which three generations of his family have earned their livelihood.

---

[1] As the Seventh Circuit warned, "Few people enjoy paying taxes . . . [but] taxpayers, even very frustrated taxpayers, should resist the false siren call of the tax protester movement." *United States v. Engh*, 330 F.3d 954, 956 (7th Cir. 2003). *See also United States v. Ford*, 514 F.3d 1047, 1053 (10th Cir. 2008) (describing tax protestor arguments as "patently frivolous"); *Stearman v. C.I.R.*, 436 F.3d 533, 537 (5th Cir. 2006) (describing tax protestor arguments as "shopworn" and "universally rejected by this and other courts"); *United States v. Cooper*, 170 F.3d 691, 691 (7th Cir. 1999) (describing tax protestor arguments as "frivolous squared"); *Crain v. C.I.R.*, 737 F.2d 1417, 1418 (5th Cir. 1984) (describing a tax protestor's appeal as "a hodgepodge of unsupported assertions, irrelevant platitudes, . . . legalistic gibberish, [and] spurious arguments").

This matter is currently before the Court on the motion for summary judgment filed by the Government on March 7, 2015 (Doc. 87). The Government seeks a judgment that, for the tax years 1991 through 1997, Mr. Sanders is liable for $441,845.75 in unpaid federal income taxes, penalties, and interest through January 31, 2015 (Doc. 87). The Government further seeks additional interest and statutory additions accruing from February 1, 2015, to the present (Doc. 87). The Government also seeks a judgment declaring that Mr. Sanders's tax liabilities constitute a valid lien on all property belonging to him—including a farm in Fayette County, Illinois, and a farm in Montgomery County, Illinois—and permitting the Government to enforce those liens by foreclosing on and selling the properties (Doc. 87).

## FACTUAL BACKGROUND

### A. The Audit and Assessments

As mentioned above, Frankie Sanders has not filed a tax return since at least 1991. The Internal Revenue Service ("IRS") eventually caught up with him, and, in 1998, the IRS began an audit of Mr. Sanders's financial dealings during the calendar years 1991 through 1997 (Docs. 87-3; 87-4). Mr. Sanders refused to respond to any of the agents' phone calls or letters or otherwise cooperate with them (Doc. 87-3). Without the documents needed to determine his tax liability, the agents attempted to reconstruct Mr. Sanders's income and tax liabilities using information obtained from public records and the records of private businesses with whom Mr. Sanders conducted business (Doc. 87-3; *see also* Doc. 87-6, ¶3 and pp. 5–50; Doc. 87-7; Doc. 87-8, pp. 1–20). In particular, the IRS agents consulted records from the United States Department of Agriculture and its Farm Services Agencies, from which they learned that Frankie Sanders operated a farm

in Fayette County, Illinois (the "Fayette farm"), which was owned by his mother Genevieve Sanders (Doc. 87-6, pp. 43–50; Doc. 87-7, pp. 1–6). The Fayette farm was purchased by Mr. Sanders's parents, Milton and Genevieve, in 1951 when Mr. Sanders was a child (Doc. 87-1, ¶2; Doc. 87-10, pp. 178, 184).[2] Mr. Sanders grew up on the Fayette farm, raised his sons there,[3] and continues to live there to this day (Doc. 87-1, ¶¶1, 3; Doc. 87-4, pp. 34–36; Doc. 87-10, p. 90).

The IRS also learned that Frankie Sanders owned and operated a second farm in Montgomery County, Illinois (the "Montgomery farm") (Doc. 87-6, pp. 43–50; Doc. 87-7, pp. 1–6). The Montgomery farm was purchased by Mr. Sanders in 1977 with a loan from the seller pursuant to a land contract (Doc. 87-1, ¶¶6, 9; Doc. 87-10, pp. 124–25, 207–251). Mr. Sanders made installment payments from 1977 to 1996 that totaled approximately $412,500 (Doc. 87-1, ¶10; Doc. 87-6, pp. 37, 38). On November 21, 1996, a warranty deed transferring title of the property to Mr. Sanders was recorded in Montgomery County, Illinois (Doc. 87-6, p. 38; Doc. 87-10, p. 218).[4] Six days later, Mr.

---

[2] At the time Milton and Genevieve Sanders bought the Fayette farm, its legal description was as follows:

> The Northwest Quarter of the Southwest Quarter of Section Twenty-seven and the Northeast Quarter of the Southeast Quarter of Section Twenty-eight, in Township Nine North, Range One West of the Third Principal Meridian, excepting however all the coal below the depth of 125 feet beneath the surface, which has been heretofore conveyed.

(Doc. 87-10, p. 178). In 1977, an adjacent portion of land, with the following legal description, was quit claimed to Milton and Genevieve:

> The West Half of the Northwest Quarter of Section 27, Township 9 North, Range 1 West of the Third Principal Meridian, except all coal underlying same, in Fayette County, Illinois.

(Doc. 87-10, p. 184)

[3] Eric Sanders was born in 1969, and Jeffrey Sanders was born in 1971 (Doc. 87-1, ¶16)

[4] At the time the Montgomery farm was deeded to Frankie Sanders, it had the following legal description:

> The Southeast Quarter (SE 1/4) of the Northeast Quarter (NE 1/4) of Section One (1) the East Half (E 1/2) of the Northeast Quarter (NE 1/4) of the Southwest Quarter (SW 1/4) of Section One (1); and the Southeast Quarter (SE 1/4) of Section One (1) in Township Nine (9) North, Range Two (2) West of the Third Principle Meridian (3rd P.M.), Except all coal underlying said premises as hereto for conveyed, Subject to all public and private

Sanders gifted about five and a half acres of the Montgomery farm to his son, Eric, and Eric's wife, Karen (Doc. 87-10, pp. 111, 219–20).[5]

From plat maps and land records maintained by the Recorder of Deeds in Fayette County and in Montgomery County, the agents determined the size and location of the Fayette farm and the Montgomery farm (Doc. 87-6, pp. 37–50; Doc. 87-7, pp. 1–5). The agents then canvassed local grain elevators, livestock dealers, and hauling companies, and, while they were able to identify some of Mr. Sanders's crop revenues, they could not assemble a reasonably complete set of business records for his farm operations (Doc. 87-1, ¶¶ 34, 35; Doc. 87-6, p. 18. *See also*, *e.g.*, Doc. 87-7, p. 19).

Left with no other option, the agents calculated Mr. Sanders's tax liability by estimating his gross income, deductions, and exemptions (Doc. 87-1, ¶36). In particular, audit reports submitted by the Government demonstrate that agents estimated grain sales based on the number of acres Mr. Sanders operated and statistical data showing the average grain yields and prices for the general area of Montgomery and Fayette Counties (*see* Doc. 87-6, pp. 20–22; Doc. 87-7, pp. 19–33).[6] Because the agents did not

---

roadways or easements as now located, situated in the Township of Witt, Montgomery County, Illinois.

(Doc. 87-10, p. 218).

[5] The legal description for the portion of the Montgomery farm deeded to Eric and Karen Sanders is as follows:

The South Half (S 1/2) of the Southeast Quarter (SE 1/4) of the Southeast Quarter (SE 1/4) of the Southeast Quarter (SE 1/4) all in Section One (1), Township Nine (9) North, Range two (2) West of the Third Principal Meridian, situated in Montgomery County, Illinois.

(Doc. 87-10, pp. 219–20).

[6] Eric Sanders later confirmed they grew crops on the Fayette farm and the Montgomery farm, including corn, soybeans, wheat, clover, and hay (Doc. 87-1, ¶¶12, 15; Doc. 87-10, pp. 90–92, 100–101, 112–118). They also raised livestock, mainly beef cattle, on the Fayette farm (Doc. 87-1, ¶14; Doc. 87-10, pp. 90–92, 100–101, 112–118). Around 1996, they switched to producing hay only on the Fayette farm, which was primarily used to feed the cattle they were raising (Doc. 87-1, ¶13; Doc. 87-10, p. 117. *See also* Doc. 87-4, p. 115). The crops grown on the Montgomery farm were sold on the open market for cash (Doc. 87-10, p.

know the financial arrangement between Mr. Sanders and his mother regarding compensation for operating the Fayette farm, all income estimated from that farm was determined to be compensation paid to Mr. Sanders (Doc. 87-7, pp. 19–33). All income estimated from the Montgomery farm was also attributed to Mr. Sanders (*see id.*).[7] Also factored into his income were the dividends that Mr. Sanders earned from the Nokomis Equity elevator and the Rosamond Cooperative (Doc. 87-7, pp. 34–35).

The audit reports further describe how the agents estimated Mr. Sanders's deductible business expenses by using statistical data to estimate his grain production costs (Doc. 87-7, pp. 45–51; Doc. 87-8, pp. 1–15). The agents also included the self-employment tax deduction (Doc. 87-7, pp. 36–41); the standard deduction (*Id.* at pp. 42–44); and the personal exemption for each respective year (Doc. 87-8, pp. 16–18). Based on Mr. Sanders's estimated adjusted gross income, the agents calculated Mr. Sanders's tax liabilities and penalties for the years 1991 through 1997 (Doc. 87-1, ¶36; Doc. 87-8, pp. 55–60).

The IRS then served Mr. Sanders with a statutory Notice of Deficiency dated May 9, 2001, for tax years 1991 through 1997, demanding payment of $130,908 in back taxes and penalties plus an undisclosed amount in interest (Doc. 87-1, ¶37; Doc. 87-6,

---

118).
[7] Eric Sanders later confirmed that during the time period at issue—1991 to 1997—Mr. Sanders worked full-time on the Fayette and Montgomery farms (Doc. 87-10, pp. 92, 103–104, 109, 115). For a majority of that time, Eric Sanders also worked full-time on the farms, but he was not paid for his work (*Id.* at pp. 103–04, 108). Sometime in 1996, Eric started getting paid ten to fifteen percent of the crop sales from the Montgomery farm, which has resulted in an average annual income of approximately $30,000 (*Id.* at pp. 118–20). Jeffrey Sanders helped out periodically when he was able, but he never worked on the farms on a full-time basis (*Id.* at pp. 103–04, 136). Milton Sanders died in 1979 (Doc. 87-10, p. 75). Genevieve Sanders was 76 in 1991; she died in 2007 at the age of 91 (*Id.* at p. 76). There were no other employees on the farms (*see id.* at pp. 103–04, 115).

¶4; *see* Doc. 87-8, pp. 21–83).[8] Mr. Sanders did not challenge the IRS's deficiency determination (Doc. 87-1, ¶38; Doc. 87-6, ¶4). Consequently, on October 15, 2001, Mr. Sanders was assessed with the income tax liabilities, penalties, and interest that had accrued to date (Doc. 87-1, ¶39; Doc. 87-6, ¶5; Doc. 87-8, pp. 85, 97, 103, 109, 115, 122, 227; Doc. 87-9).[9] Years later, in March 2006, Mr. Sanders was assessed with additional penalties (Doc. 87-1,¶39; Doc. 87-6, ¶5; Doc. 87-8, pp. 85, 97, 103, 109, 115, 122, 227; Doc. 87-9). The Government claims that a notice of the assessment and a demand for payment was mailed to Mr. Sanders on the same day of (or shortly after) each assessment (Doc. 87-1, ¶40; Doc. 87-9). All assessments are contained in the following table:

| Tax Year | Assessment Date | Assessment Type | Assessment Amount |
|---|---|---|---|
| 1991 | Oct. 15, 2001 | Tax by examination | $9,890.00 |
| 1991 | Oct. 15, 2001 | IRC §6651(a)(1) failure to file penalty | $2,472.50 |
| 1991 | Oct. 15, 2001 | IRC §6654 estimated tax penalty | $565.22 |
| 1991 | Oct. 15, 2001 | Interest to assessment date | $14,659.07 |
| 1991 | March 27, 2006 | IRC § 6651(a)(2)-(3) failure to pay penalty | $2,472.50 |
| 1992 | Oct. 15, 2001 | Tax by examination | $13,997.00 |
| 1992 | Oct. 15, 2001 | IRC §6651(a)(1) failure to file penalty | $3,499.25 |
| 1992 | Oct. 15, 2001 | IRC §6654 estimated tax penalty | $610.49 |
| 1992 | Oct. 15, 2001 | Interest to assessment date | $18,002.90 |
| 1992 | March 27, 2006 | IRC § 6651(a)(2)-(3) failure to pay penalty | $3,499.25 |
| 1993 | Oct. 15, 2001 | Tax by examination | $18,939.00 |
| 1993 | Oct. 15, 2001 | IRC §6651(a)(1) failure to file penalty | $4,734.75 |
| 1993 | Oct. 15, 2001 | IRC §6654 estimated tax penalty | $793.53 |
| 1993 | Oct. 15, 2001 | Interest to assessment date | $21,112.20 |

---

[8] Figure rounded to the nearest dollar.

[9] As proof of the assessments, the Government submitted "transcripts of account" (Doc. 87-6, ¶5, Doc. 87-8, pp. 85, 97, 103, 109, 115, 122, 227). These account transcripts are largely incomprehensible on their face to any non-IRS employee because almost every piece of information is represented by a code. With the help of the declarations from the IRS personnel (Doc. 87-6; 87-9) and the IRS's Transaction Codes Pocket Guide (available at https://www.irs.gov/pub/irs-utl/ transaction_codes_pocket_guide.pdf), the Court was able to decipher the following information: the taxable year, the date the tax and penalties were assessed, and the amount assessed.

| Tax Year | Assessment Date | Assessment Type | Assessment Amount |
|---|---|---|---|
| 1993 | March 27, 2006 | IRC § 6651(a)(2)-(3) failure to pay penalty | $4,734.75 |
| 1994 | Oct. 15, 2001 | Tax by examination | $11,924.00 |
| 1994 | Oct. 15, 2001 | IRC §6651(a)(1) failure to file penalty | $2,981.00 |
| 1994 | Oct. 15, 2001 | IRC §6654 estimated tax penalty | $618.78 |
| 1994 | Oct. 15, 2001 | Interest to assessment date | $11,027.80 |
| 1994 | March 27, 2006 | IRC § 6651(a)(2)-(3) failure to pay penalty | $2,981.00 |
| 1995 | Oct. 15, 2001 | Tax by examination | $15,027.00 |
| 1995 | Oct. 15, 2001 | IRC §6651(a)(1) failure to file penalty | $3,756.75 |
| 1995 | Oct. 15, 2001 | IRC §6654 estimated tax penalty | $814.82 |
| 1995 | Oct. 15, 2001 | Interest to assessment date | $11,029.95 |
| 1995 | March 27, 2006 | IRC § 6651(a)(2)-(3) failure to pay penalty | $3,756.75 |
| 1996 | Oct. 15, 2001 | Tax by examination | $16,268.00 |
| 1996 | Oct. 15, 2001 | IRC §6651(a)(1) failure to file penalty | $3,660.30 |
| 1996 | Oct. 15, 2001 | IRC §6654 estimated tax penalty | $865.87 |
| 1996 | Oct. 15, 2001 | IRC § 6651(a)(2)-(3) failure to pay penalty | $4,067.00 |
| 1996 | Oct. 15, 2001 | Interest to assessment date | $9,045.11 |
| 1997 | Oct. 15, 2001 | Tax by examination | $10,594.00 |
| 1997 | Oct. 15, 2001 | IRC §6651(a)(1) failure to file penalty | $2,383.65 |
| 1997 | Oct. 15, 2001 | IRC §6654 estimated tax penalty | $566.80 |
| 1997 | Oct. 15, 2001 | IRC § 6651(a)(2)-(3) failure to pay penalty | $2,224.74 |
| 1997 | Oct. 15, 2001 | Interest to assessment date | $4,273.67 |

**B.  Transfer of Property**

By late 2009, despite multiple notices and demands for payment, Mr. Sanders still refused to either remit payment or to acknowledge the IRS's collection efforts in any manner (Doc. 87-6, ¶5; Doc. 87-9). At that point, the IRS proceeded with collection efforts, including serving Mr. Sanders with a collection summons and then filing a civil action to enforce the summons (Doc. 87-4, ¶¶6, 7 and pp. 11–15; Doc. 87-9). *See also United States v. Frankie Sanders*, Case No. 10-cv-358-WDS-SCW (S.D. Ill.). As part of the enforcement action, Mr. Sanders was questioned under oath by an IRS agent on August 2, 3, and 16, 2010 (*see* Doc. 87-4, ¶8 and pp. 19–106, 107–138). Mr. Sanders also produced documents for the IRS agent to examine, including trust documents, bank statements,

title documents, and other business records (Doc. 87-4, ¶¶9, 10 and pp. 2, 138–74; Doc. 87-5). While none of those documents shed any light on Mr. Sanders's taxable income from 1991 through 1997, the documents were still of some value—from those documents, the Government learned that, after the IRS began its audit of his finances, ownership of the Fayette farm and the Montgomery farm was transferred into two trusts (Doc. 87-1, ¶51).

The first trust, the Y&K Leasing Trust, was created on September 16, 1999 (Doc. 87-1,¶52, Doc. 87-4, pp. 139–174). Mr. Sanders obtained the trust documents from Thomas Magro, a fellow tax protestor (Doc. 87-1, ¶51; Doc. 87-4, p. 102).[10] The documents purportedly created something called a "Pure Trust" through which a citizen can elect to be governed by common law and to be exempt from legislative enactments like the Internal Revenue Code ("IRC") (Doc. 87-1, ¶55; Doc. 87-4, pp. 139–74; Doc. 87-5, pp. 1–65). Mr. Sanders and his two sons, Eric and Jeffrey, were named trustees of the Trust (Doc. 87-4, pp. 146, 165, 169–172). No beneficiaries were named (*see id.* at pp. 139–174). It appears that at the time the trust documents were executed, only personal property items were placed in trust (*Id.* at p. 167).[11] No real estate was placed in trust (*Id.* at p. 166). Approximately two weeks after the trust was created, however, Mr. Sanders recorded a deed in Montgomery County, Illinois, purporting to transfer

---

[10] In 1997, Magro was sanctioned $200 by the Central District of Illinois after participating in two tax protest lawsuits within two years. *LaRue v. United States*, 959 F. Supp. 959, 961 (C.D. Ill. 1997). Magro also attempted to appear as counsel on behalf of Frankie Sanders in another tax case pending before the undersigned, even though Magro is not a licensed attorney. *United States v. Frankie Sanders*, 12-cv-96-NJR-SCW (S.D. Ill.) at Doc. 73, pp. 3–5, 8.

[11] Schedule "B" attached to the trust instrument provides that "Other personal property: (such as tools, bank accounts, furniture, fixtures, and other per the attached inventory)" is included in the trust (Doc. 87-4, p. 167). There is no inventory in the record, however.

ownership of the Montgomery farm from himself to the Y&K Leasing Trust (Doc. 87-1, ¶53; Doc. 87-10, p. 221).

The second trust, the Triple S Family Trust, was created by Genevieve Sanders, on November 8, 2002, with the assistance of attorney Jerold Barringer, a tax protestor who routinely represents other tax protestors (Doc. 87-1, ¶60; Doc. 87-5, pp. 66–90).[12] The documents purportedly created a "Pure Common Law Trust Organization" that is exempt from the laws and regulations applicable to a corporation, partnership, trust, grantor trust, or any other type, class, or form of business organization or entity (Doc. 87-5, pp. 68–69). Under the terms of the trust, the Fayette farm was to be held in trust (Doc. 87-5, p. 87). The same day the trust was created, Genevieve Sanders recorded a deed in Fayette County, Illinois, transferring ownership of the Fayette farm from herself to the Triple S Family Trust (Doc. 87-1, ¶60; Doc. 87-10, pp. 195–96).

Frankie Sanders was named as a trustee of the Triple S Family Trust, and Eric and Jeffrey Sanders were named as his successor trustees (Doc. 87-1, ¶61; Doc. 87-5, pp. 84, 89). Genevieve was also named as a trustee, but no successor trustees were named

---

[12] Jerold Barringer has been the subject of at least one case to enforce an IRS summons and one tax collection case. *United States v. Barringer*, Case No. 12-cv-3324-SEM-TSH (C.D. Ill.) (IRS enforcement action); *United States v. Barringer*, Case No. 14-3132 (C.D. Ill.) (tax collection action). Barringer represented Frankie Sanders in this matter until he was suspended from practicing in this district based on his suspension from the Tenth Circuit for making frivolous arguments in a tax-related case. *In re: Barringer*, 11-816 (10th Cir. 2011); 12-mc-78-DRH (S.D. Ill. 2012); 15-mc-45-MJR (S.D. Ill. 2015). Barringer was also sanctioned $10,000 by the Seventh Circuit for the same reason and suspended for six months by the Illinois Supreme Court, which led to his suspension in the Eighth Circuit, the Third Circuit, and a number of district courts. *United States v. Patridge*, 507 F.3d 1092, 1095 (7th Cir. 2007) (remarking that Barringer "performed below the standard of a *pro se* litigant; we have serious doubt about his fitness to practice law. The problem is not simply his inability to distinguish between plausible and preposterous arguments. It is his disdain for the norms of legal practice . . . and the rules of procedure."); *In re: Barringer*, 15-9011 (8th Cir. 2015); 15-8069 (3d Cir. 2015); 15-mc-1008 (C.D. Ill. 2015); 15-mc-403-JFC (W.D. Penn. 2015); and 15-mc-50770-GER (E.D. Mich. 2015).

for her (Doc. 87-1, ¶61; *see* Doc. 87-5, pp. 85, 89).[13] According to the trust instrument, the trustees held all legal and equitable title and had complete management and control of the property held in trust (Doc. 87-5, pp. 68–69, 73–74); they were the "absolute owners of" the trust property (*Id.* at p. 73). The trust instrument also authorized the issuance of 1,000 trust units to investors, to be evidenced by Trust Certificates for a given number of units (*Id.* at pp. 75–76). The Certificate holders did not have "any legal or equitable title in or to" the trust property, and they did not "have any right to manage or control the destiny, property, affairs, or business" of the trust (*Id.* at pp. 76, 77). Instead, the Certificate holders were entitled to a portion of the income or surplus earned, and those payments were made as the trustees deemed it "proper and advisable" (*Id.* at p. 77). All 1,000 trust certificate units were purchased by Frankie Sanders for $10 (*Id.* at p. 83).

## C.  The Tax Liens

In August 2010, the Government recorded a federal tax lien in Montgomery County, Illinois, with respect to the Montgomery farm (Doc. 87-10, p. 223). This notice identified Frankie Sanders as the taxpayer (*Id.*). By then Mr. Sanders's tax liability had grown to $237,913 (*Id.*). Two other notices were filed against the Montgomery farm in April 2011 identifying the taxpayers as "Eric and Karen Sanders as Nominees of Frankie Sanders" and Y&K Leasing; Frankie Sanders, Trustee; Frankie Sanders, Beneficiary; as Nominee of Frankie Sanders" (Doc. 87-10, pp. 224, 225). All three notices were refiled in October 2011 (Doc. 87-10, pp. 226–35).

---

[13] The documents states: "FRANK SANDERS, the first Trustee of this Trust Organization, and GENEVIEVE SANDERS, the second Trustee of this Trust Organization, do hereby designate as Successor Trustees, Eric Sanders of Nokomis, Illinois and Jeff Sanders of Kincaid, Illinois. . . . Each Successor Trustee will become a trustee of this Trust Organization upon the death, incapacity or resignation of Frank Sanders as a Trustee of this Trust Organization . . . ." (Doc. 87-5, p. 89).

In April 2011, the Government also recorded a federal tax lien in Fayette County, Illinois, with respect to the Fayette farm in the amount of $237,949 (Doc. 87-10, p. 202). This notice identified the taxpayers as "Triple S Family Trust; Frankie Sanders, Trustee; Frankie Sanders, Beneficiary; as Nominee of Frankie Sanders" (*Id*.). This notice was refiled in October 2011 as two separate notices—one for $217,907 and one for $20,043 (Doc. 87-10 pp. 203–06).

By January 31, 2015, due to accruing interest on the unpaid taxes and penalties, Mr. Sanders's total tax liability for the years 1991 through 1997 had ballooned to $441,845.75 (Doc. 87-6; Doc. 87-8, pp. 131–37). To date, he has not made any voluntary payments towards his tax liability (Doc. 87-6, ¶5).

| Tax Year | Balance Due as of January 19, 2012 |
|----------|-------------------------------------|
| 1991 | $47,813.68 |
| 1992 | $75,475.74 |
| 1993 | $94,633.66 |
| 1994 | $55,462.59 |
| 1995 | $64,457.28 |
| 1996 | $65,097.98 |
| 1997 | $38,904.82 |
| **TOTAL** | **$441,845.75** |

## PROCEDURAL HISTORY

The Government filed this collection lawsuit on October 11, 2011 (Docs. 1, 2). Mr. Sanders was initially represented by attorney Jerold Barringer. Mr. Barringer was terminated as Mr. Sanders's attorney in December 2012, however, because he was suspended from practicing in this district (Doc. 35). Since then, Mr. Sanders has represented himself. For over four years, this case languished on the Court's docket due almost exclusively to Mr. Barringer and Mr. Sanders's obstructionist behavior that is

classic of the tax-protestor movement: they made ever-changing, nonsensical arguments as to why Mr. Sanders does not have to pay taxes, they resisted discovery then made empty promises to produce documents, they refused to answer the Government's questions with any candor, and they refused to obey orders of this Court.[14]

The Court wants to highlight a few of Mr. Sanders's actions, which are of particular consequence at this stage of the litigation for reasons that will become apparent later in this Order. First, during the course of discovery, the Government requested and the Court ordered Mr. Sanders to produce financial records for the Fayette farm, the Montgomery farm, the Y&K Leasing Trust, and the Triple S Family Trust (Doc. 87-10, ¶¶3, 5 and pp. 5–27; Doc. 58; Doc. 65; Doc. 68). To date, Mr. Sanders has produced nothing responsive to the Court's order.

On March 26, 2012, the Government also served Mr. Sanders with requests to admit the accuracy of the income tax assessments for 1991 through 1997 (Doc. 87-10, ¶¶6–10 and pp. 58–70). On October 9, 2012, five months after the response deadline had expired, Mr. Barringer sent responses to the Government via electronic mail (*Id.*). Mr. Barringer had not, however, requested an extension of time to respond, and the Government had not consented in writing to service by electronic means (*Id.*). In the responses, Mr. Barringer denies that the Government "had the authority to make such assessment[s]" and asserts that the assessments are "not accurate" (*Id.*).

---

[14] The case was originally assigned to Senior District Judge William D. Stiehl, who has since retired and recently passed away. The case was reassigned to the undersigned District Judge on May 19, 2014 (*see* Doc. 69).

The Government served Mr. Sanders on January 24, 2013, with a second set of requests to admit that he is the sole owner of the Fayette farm and the Montgomery farm (Doc. 87-10, ¶¶11–13 and pp. 71–74). To date, Mr. Sanders has not responded (*Id.*).

On March 7, 2015, the Government filed a motion for summary judgment seeking the relief described above. *See supra* p. 2. Mr. Sanders's response to the motion for summary judgment was originally due on April 9, 2015, but he was given two extensions of time totaling four months (Docs. 87, 91, 93). Mr. Sanders then requested an additional ninety days to respond because he did not have an attorney and he needed more time to process the 700-plus pages of evidence submitted by the Government (Doc. 94). His request was denied because his reasons for needing the extension of time were disingenuous, and the undersigned was out of patience with his delay tactics (Doc. 96). Shortly thereafter, Mr. Sanders filed a one-page response in which he claimed that he had completed "a Revocation of Election and removed himself from any claims by the IRS that he is a taxpayer" (Doc. 99). The attached thirty-page "Revocation of Election" declares that Mr. Sanders has revoked his status as a taxpayer (Doc. 99-1).

## DISCUSSION

### A. Summary Judgment Standard

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. A "material fact" is one identified by the substantive law as affecting the outcome of the suit. A "genuine issue" exists with respect to any such material fact . . .

when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." On the other hand, where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is nothing for a jury to do. In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party.

*Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citations omitted).

In this case, Frankie Sanders's response to the Government's motion for summary judgment is essentially a non-response. He did not dispute any of the Government's material facts (*see* Doc. 99), and consequently, those facts are deemed admitted to the extent they are properly supported by record evidence. FED. R. CIV. P. 56(e); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (citations omitted). Mr. Sanders also did not dispute any of the Government's arguments (*see* Doc. 99). This failure, however, does not automatically result in judgment for the Government. *Gerhartz v. Richert*, 779 F.3d 682, 685–86 (7th Cir. 2015); *Keeton*, 667 F.3d at 884 (citations omitted). The Government must still demonstrate "that judgment is proper as a matter of governing law." *Gerhartz*, 779 F.3d at 686 (citations omitted). And the Court must still view all of the facts asserted by the Government in the light most favorable to Mr. Sanders and draw all reasonable inferences in his favor. *Keeton*, 667 F.3d at 884 (citations omitted).

### B. Relevant Tax Principles

"All individuals, natural or unnatural, must pay federal income tax on their wages," *United States v. Sloan*, 939 F.2d 499, 501 (7th Cir. 1991). Generally, individuals self-report their income tax liability for a given year by filing a tax return. *See Gyorgy v. Comm'r*, 779 F.3d 466, 472 (7th Cir. 2015) (citing I.R.C. § 6011(a)). When an individual

fails to file an income tax return, however, a tax deficiency arises. *Kanter v. Comm'r*, 590 F.3d 410, 418 (7th Cir. 2009). Once the IRS determine the amount of the deficiency, it must send the individual a notice identifying the amount owed. *Gyorgy*, 779 F.3d at 472 (citing I.R.C. §§ 6212(a) and 6213(a)). The individual then has ninety days from the date the notice was mailed to contest the IRS's deficiency determination by filing a petition in the tax court. *Gyorgy*, 779 F.3d at 472 (citing I.R.C. §§ 6213(a), 6214(a)). If the individual does not file a timely petition with the tax court, then the deficiency "shall be assessed, and shall be paid upon notice and demand." *Gyorgy*, 779 F.3d at 472 (citing I.R.C. § 6213(c)).

"An 'assessment' amounts to an IRS determination that a taxpayer owes the Federal Government a certain amount of unpaid taxes." *United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 242 (2002). A tax assessment is made "by recording the liability of the taxpayer in the office of the Secretary in accordance with rules or regulations prescribed by the Secretary." I.R.C. § 6203. In other words, the assessment is "essentially a bookkeeping notation" in the IRS's books "establish[ing] an account against the taxpayer on the tax rolls." *Laing v. United States*, 423 U.S. 161, 171 n.13 (1976); *Wadleigh v. Comm'r*, 134 T.C. 280, 289 (T.C. 2010) ("A person's liability to pay a tax is established by assessment, which is the formal recording of a liability in the records of the Commissioner."); *United States v. Buckner*, 264 B.R. 908, 913 (N.D. Ind. 2001) ("An assessment reflects the I.R.S.'s judgment of what taxes are owed by the taxpayer as recorded on the I.R.S.'s books of account."); WILLIAM D. ELLIOT, FED. TAX COLLECTIONS, LIENS AND LEVIES, ¶¶ 1.02, 2.03 *available at* 1999 WL 629195 ("The assessment . . . is

nothing more than the ministerial acts of a Service official signing his or her name to an assessment register.") Nowadays, an assessment is just a computer entry. *Meyer v. Comm'r*, 106 T.C.M. (CCH) 599, at *3 (T.C. 2013).

After the assessment is made, the Government must demand payment from the taxpayer. I.R.C. § 6303(a). If the individual still does not pay after receiving the demand for payment, a tax lien in "the amount so assessed" automatically attaches to all property or rights to property belonging to the taxpayer. *Gyorgy*, 779 F.3d at 472 (citing I.R.C. § 6321); I.R.C. § 6322; ELLIOT at ¶ 1.02, *available at* 1999 WL 629195 ("The federal tax lien arises upon assessment, notice and demand, and failure to pay the tax liability.") To secure its lien against other creditors, the IRS can file a notice of the lien with the appropriate state or local government office. *Gyorgy*, 779 F.3d at 472 (citing I.R.C. §§ 6323(a), (f)). The IRS must then inform the taxpayer that it filed the lien notice. *Gyorgy*, 779 F.3d at 472 (citing I.R.C. § 6320(a)).

Interest begins to accrue on federal tax liabilities on the date the tax is originally due. I.R.C. §§ 6601(a), 6621. The interest continues to accrue so long as the liabilities remain unpaid. I.R.C. § 6601(a); ELLIOT at ¶ 5.03, *available at* 1999 WL 629223.

## C.  Analysis

The Government argues that this Court should grant its motion for summary judgment because there is no genuine dispute as to any material fact concerning Mr. Sanders's liability for the tax debts at issue, the validity of the federal tax liens, or the right of the United States to enforce those liens against the Fayette farm and Montgomery farm.

### 1.   Reduction of the Tax Assessments to Judgment

The Government first seeks to reduce to judgment its assessments against Mr. Sanders for unpaid taxes, penalties, and interest.

In an action to collect taxes from an individual, the initial burden is on the Government to show what taxes are due. *See, e.g., Nakano v. United States*, 742 F.3d 1208, 1211 (9th Cir. 2014) (citing *Oliver v. United States,* 921 F.2d 916, 919 (9th Cir. 1990)); *United States v. Sarubin,* 507 F.3d 811, 816 (4th Cir. 2007). "That burden is satisfied by the IRS's 'deficiency determinations and assessments for unpaid taxes,' which are presumed correct 'so long as they are supported by a minimal factual foundation.'" *In re Olshan*, 356 F.3d 1078, 1084 (9th Cir. 2004) (quoting *Palmer v. I.R.S.*, 116 F.3d 1309, 1312 (9th Cir. 1997)); *United States v. Fior D'Italia, Inc.,* 536 U.S. 238, 242 (2002) ("It is well established in the tax law that an assessment is entitled to a legal presumption of correctness . . . ."); *see also United States v. White*, 466 F.3d 1241, 1248 (11th Cir. 2006) ("In reducing an assessment to judgment, the Government must first prove that the assessment was properly made."). The legal presumption of correctness "shifts the burden of proof to the taxpayers to show that the determination is incorrect." *Palmer*, 116 F.3d at 1312; *Pittman v. Comm'r,* 100 F.3d 1308, 1313 (7th Cir. 1996). "To rebut the presumption of correctness, the taxpayer has the burden of proving that the assessment is 'arbitrary or erroneous.'" *United States v. Stonehill*, 702 F.2d 1288, 1294 (9th Cir. 1983) (quoting *Helvering v. Taylor,* 293 U.S. 507, 515 (1935)).

As the Government candidly acknowledges, the accuracy of its assessments in this case is not perfect because, due to the lack of complete records, it had to reconstruct

Mr. Sanders's income through indirect means (Doc. 87-2). Any imperfections, however, are Mr. Sanders's fault. That is because it is the taxpayer's responsibility "to keep adequate records from which their correct tax liability may be determined." *JPMorgan Chase & Co. v. Comm'r*, 530 F.3d 634, 638-39 (7th Cir. 2008) (citing I.R.C. § 6001). When the taxpayer has failed to maintain adequate records of income, and other available records are not sufficient to establish income, the IRS is authorized to reconstruct the taxpayer's income using indirect methods in order to determine the amount of any deficiency. *McHan v. Comm'r*, 558 F.3d 326, 332 (4th Cir. 2009); *Williams v. Comm'r*, 999 F.2d 760, 763 (4th Cir. 1993) (citing *Holland v. United States*, 348 U.S. 121, 130 (1954)). *See also Kanter v. Comm'r*, 590 F.3d 410, 426 (7th Cir. 2009) ("The Commissioner is empowered to use several methods to reconstruct a taxpayer's taxable income."); *Palmer,* 116 F.3d at 1312 ("The Commissioner . . . has wide discretion in choosing an income-reconstruction method.") The IRS's estimate will still carry a presumption of correctness so long as "the method used to make the estimate is a 'reasonable' one." *Fior D'Italia*, 536 U.S at 243.

Here, the Government introduced sufficient evidence to meet its initial burden and trigger the legal presumption of correctness afforded to tax assessments. In particular, the Government submitted the working papers, notes, and signed declarations from the agents who conducted the **audit of** Frankie Sanders and **his farm operations**, as well as deposition testimony from Mr. Sanders and his son. This evidence demonstrates that Mr. Sanders received tens of thousands of dollars of unreported income from 1991 through 1997. The Government also submitted the deficiency notice

generated as a result of the investigation along with audit reports. This evidence shows that statistical data was used to estimate Mr. Sanders's adjusted gross income, which is a reasonable method for reconstructing income. *See Fior D'Italia,* 536 U.S. at 243 (citing *Pollard v. Comm'r,* 786 F.2d 1063, 1066 (11th Cir. 1986) (upholding estimate using statistical tables reflecting cost of living where taxpayer lived)); *Palmer,* 116 F.3d at 1312 ("Courts have long held that the IRS may rationally use statistics to reconstruct income where taxpayers fail to offer accurate records.") The audit reports further demonstrate how Mr. Sanders's tax liabilities and penalties were calculated. Finally, the Government submitted computerized account transcripts, supplemented by declarations from IRS personnel, documenting the assessment of income tax and penalties against Mr. Sanders and the accrual of interest. Therefore, the evidence creates a presumption that the assessments were properly made and are valid.

Consequently, Mr. Sanders bears the burden of proving the assessment is incorrect, which he quite obviously cannot do. First, as a result of his failure to timely respond to the Government's request to admit the accuracy of the 1991-1997 income tax assessments, those matters are deemed admitted. FED. R. CIV. P. 36(a)(3). Even if that were not the case, Mr. Sanders has not come forward with an alternative calculation regarding his tax liability or a reasonably complete set of financial records that would support any alternative calculation. In fact, during the course of discovery in this matter, Mr. Sanders refused to produce any financial records that would have allowed the Government to make an alternative assessment. Therefore, Mr. Sanders has failed to rebut the presumption of correctness applied to the assessment of his tax deficiency.

Page 19 of 28

In conclusion, based on the presumption of correctness that attaches to the IRS's assessment, and Mr. Sanders's complete failure to dispute it, let alone to overcome the presumption, the Court must conclude that the Government is entitled to judgment as a matter of law on Mr. Sanders's tax liabilities pertaining to tax years 1991 through 1997. The motion for summary judgment is granted in the amount of the deficiency (including interest and statutory penalties) for tax years 1991 through 1997—$441,845.75—plus the additional interest and statutory penalties accruing from February 1, 2015.

### 2. Enforcement of the Tax Liens

A federal tax lien arises at the time of the tax assessment and continues until the assessment, or a judgment arising from the assessment, is satisfied or expires. I.R.C. § 6322. The lien extends to include "any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto." I.R.C. § 6321. The lien attaches to all of the taxpayer's "property and rights to property, whether real or personal." I.R.C. § 6321; *United States v. Swan*, 467 F.3d 655, 656 (7th Cir. 2006); *United States v. Troyer*, 983 F.2d 1074 (7th Cir. 1992). "The statutory language 'all property and rights to property,' appearing in § 6321 is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *United States v. National Bank of Commerce*, 472 U.S. 713, 719–720 (1985), *cited in Drye v. United States,* 528 U.S. 49, 56 (1999). The lien attaches not only to property owned by the taxpayer on the date of assessment, but also to property acquired at any time after assessment. *Glass City Bank v. United States*, 326 U.S. 265, 267 (1945). The Government

can bring suit to enforce its tax liens against property owned by the taxpayer through the sale of such property. I.R.C. § 7403.

Here, the federal tax liens associated with Mr. Sanders's income tax liabilities for the years 1991-1997 arose and attached to his property on October 15, 2001, the date of the IRS assessments. It is undisputed that Mr. Sanders has not paid any portion of what he owes in back taxes, penalties, and interest. Consequently, the federal tax liens are valid and remain attached to his property. The critical question in this case is whether that property includes the Fayette farm and the Montgomery farm. To answer this question, the Court must determine whether Frankie Sanders had any rights to the farms. If the answer is yes, then the Government can seize the farm to satisfy its tax claim against Mr. Sanders.

### a. Montgomery Farm and the Y&K Leasing Trust

As previously discussed, Frankie Sanders created the Y&K Leasing Trust and purportedly transferred ownership of the Montgomery farm from himself to the Trust (Doc. 87-10, p. 221). The Government first contends that Mr. Sanders is the real owner of the Montgomery farm because the Y&K Leasing Trust is a sham trust (Doc. 87-2, p. 13). The Government sets forth a number of facts in support of this argument. For example, the Government noted that trust instrument did not identify a beneficiary; the trust does not have a bank account and has never paid out or received any money; the trust does not have a general ledger accounting system or an accountant; the trust does not have a lawyer; and tax returns have never been prepared or filed for the trust (Doc. 87-2, p. 13). The Government did not, however, set forth the legal standard for determining

the existence of a sham trust, and thus the Court has no framework for evaluating the facts set forth by the Government. Consequently, the Court declines to address the merits of this argument. *See, e.g., United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003).

In the alternative, the Government argues that the Y&K Leasing Trust is Mr. Sanders's nominee, thus subjecting the Montgomery farm to the tax liens assessed against him (Doc. 87-2, p. 14). "A nominee is one who holds bare legal title to property for the benefit of another." *Scoville v. United States,* 250 F.3d 1198, 1203 (8th Cir. 2001) (citing *Black's Law Dictionary* (7th ed. 1999)). In other words, a nominee is "someone who has legal title [to the property] when, in substance, the taxpayer enjoys the benefits of ownership." *United States v. Wesselman*, 406 F. App'x 64, 65 (7th Cir. 2010). WILLIAM D. ELLIOT, FED. TAX COLLECTIONS, LIENS AND LEVIES, ¶9.10, *available at* 1999 WL 629255 ("The nominee doctrine . . . seeks an answer to the question of whether the taxpayer has used a legal fiction of transferring title to property to another while retaining the benefits of true ownership.") Federal tax liens attach to property belonging to the taxpayer and also to property held by the taxpayer's nominees. *Wesselman*, 406 F. App'x at 65 (citing *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 350–51 (1977)).

To determine whether a trust serves as a taxpayer's nominee, district courts in the Seventh Circuit have examined several factors including: (1) whether the nominee paid adequate consideration for the property; (2) whether the property was placed in the name of the nominee in anticipation of a lawsuit or occurrence of liabilities while the transferor continues to exercise control over the property; (3) whether there is a close relationship between the nominee and the taxpayer; (4) the failure to record the

conveyance; (5) whether the transferor retained possession of the property; and (6) whether the transferor continued to enjoy the benefits of the transferred property. *United States v. Cohen*, 930 F. Supp. 2d 962, 979 (C.D. Ill. 2013); *United States v. Northern States Investments, Inc.*, 670 F. Supp. 2d 778, 788–89 (N.D. Ill. 2009); *United States v. Wesselman*, No. 05-CV-4152-JPG, 2010 WL 1654899, at *4 (S.D. Ill. Apr. 22, 2010), *aff'd*, 406 F. App'x 64 (7th Cir. 2010). "Additional considerations include whether the taxpayer used the putative nominee's funds to satisfy his personal expenses, whether the putative nominee interfered in any way with the taxpayer's use of the property, whether the taxpayer held himself out as the owner of the property, whether the taxpayer pays real estate taxes and other maintenance charges, and whether the taxpayer pays the fair rental value of the property." *N. States Investments, Inc.*, 670 F. Supp. 2d at 789 (citations omitted).

Based on the relevant factors, no reasonable factfinder could conclude that the Y&K Leasing Trust was not Frankie Sanders's nominee. The evidence establishes that Frankie Sanders paid over $400,000 for the Montgomery farm; however, there is no evidence that in 1999, when the Y&K Leasing deed was recorded, consideration of any substance passed to Mr. Sanders in exchange for the Montgomery Farm. Additionally, Mr. Sanders placed the Montgomery farm in trust after he knew the IRS was conducting an audit of his taxes. There is also a close relationship between Mr. Sanders and the trust—he was a trustee along with his two sons. And it is clear that Mr. Sanders retains possession and control of the farm. After the purported transfer of the farm, Mr. Sanders continued working on it full-time; he reduced his working hours only in recent

years due to his advancing age. He also continued to benefit from the income produced by the farm—in 1996, Eric began receiving ten to fifteen percent of the crop sales, which he continues to receive to this day, and the remaining income goes to Mr. Sanders. Consequently, the Court must conclude that the Y&K Leasing Trust was merely Mr. Sanders's nominee. Also, as a result of his failure to timely respond to the Government's request to admit that he is the true owner of the Montgomery farm, that matter is deemed admitted. FED. R. CIV. P. 36(a)(3).

Accordingly, the Government is entitled to judgment as a matter of law that the federal tax liens attached to the Montgomery farm on October 15, 2001.

### 3. The Fayette Farm and the Triple S Family Trust

As previously discussed, Genevieve Sanders created the Triple S Family Trust and transferred ownership of the Fayette farm from herself to the Trust (Doc. 87-10, pp. 66–90, 195–96). The Government contends that after Genevieve Sanders's death, Frankie Sanders held both legal title and equitable title to the Fayette farm, and therefore, the trust ceased to exist (Doc. 87-2, pp. 12–13). Thus, according to the Government, Frankie Sanders is the true owner of the Fayette farm and the federal tax lien attached to the farm (*Id.*). The Government does not make any arguments regarding the creation of the trust or the validity of the trust prior to Genevieve Sanders's death. Accordingly, the Court will not examine those issues. The Court will keep its analysis cabined to the argument made by the Government.

In a classic trust situation, the trustee holds legal title to the trust property for the benefit of the beneficiaries, who hold the equitable title to the trust property pursuant to

the trust agreement. *See, e.g., Culicchia v. Hupfauer*, 884 N.E.2d 730, 733 (Ill. App. Ct. 2008); *In re Estate of Mendelson*, 697 N.E.2d 1210, 1212 (Ill. App. Ct. 1998); 35 ILL. LAW AND PRAC. TRUSTS § 68. "[O]rdinarily a trust cannot exist when the legal and beneficial interest are in the same person." 35 ILL. LAW AND PRAC. TRUSTS §§ 7, 78. Consequently, it follows that the sole beneficiary of the trust cannot be the sole trustee. UNIF. TRUST CODE § 402(a)(5) ("A trust is created only if . . . the same person is not the sole trustee and sole beneficiary."); RESTATEMENT (FIRST) OF TRUSTS § 99(5) (1935) ("The sole beneficiary of a trust cannot be the sole trustee of the trust."); RESTATEMENT (THIRD) OF TRUSTS § 32, cmt. b (2003); *Wilson v. Harrold*, 123 N.E. 563, 564 (1919) ("It is undoubtedly true that the same person cannot be at the same time sole trustee and sole beneficiary of the same identical interest . . . .") If one person acquires legal and equitable title, the trust terminates and the beneficiary holds the property free of trust. RESTATEMENT (THIRD) OF TRUSTS § 69 cmt. b (2003); 35 ILL. LAW AND PRAC. TRUSTS § 77; 19 Ill. PRAC., ESTATE PLANNING & ADMIN. § 228:7 (4th ed.).

Although the trust instrument did not explicitly identify any beneficiaries, based on the terms of that instrument, it appears that the beneficiaries of the Triple S Family Trust were the certificate holders. *See, e.g.,* 19 ILL. PRAC., ESTATE PLANNING & ADMIN. § 215:1 (4th ed.) ("A beneficiary of a trust is any person who is entitled, or who may become entitled, to some part or all of the income or principal, or both, of the trust.") As the only certificate holder, Frankie Sanders was the sole beneficiary of the Triple S Family Trust. And he became the sole trustee of the Triple S Family Trust when Genevieve Sanders died, because the trust instrument did not provide for any successor

trustees for her. Mr. Sanders has not given any indication or set forth any evidence that he declined to serve as sole trustee following the death of his mother. Accordingly, as of Genevieve Sanders's death on January 27, 2007, Frankie Sanders held the legal interest in the Fayette farm, as well as the equitable interest. *See* Restatement (Third) of Trusts § 69 cmt. b (2003). There is no evidence that this did not encompass the whole trust interest. Consequently, the Triple S Family Trust terminated, and Frankie Sanders held the Fayette farm free of trust. And, once again, as a result of Mr. Sanders's failure to timely respond to the Government's request to admit that he is the true owner of the Fayette farm, that matter is deemed admitted. Fed. R. Civ. P. 36(a)(3).

Accordingly, the Court must conclude that Frankie Sanders has an interest in the Fayette farm, and the Government is entitled to judgment as a matter of law **that the** federal tax liens attached to the Fayette farm on October 15, 2001.

## CONCLUSION

The motion for summary judgment filed by the Government (Doc. 87) is **GRANTED.**

**IT IS HEREBY ORDERED and ADJUDGED** that:

1.      Frankie Sanders is liable to the United States in the amount of $441,845.75 for income tax liabilities pertaining to years 1991 through 1997, itemized as follows:

| Tax Year | Balance Due as of January 19, 2012 |
|----------|-------------------------------------|
| 1991 | $47,813.68 |
| 1992 | $75,475.74 |
| 1993 | $94,633.66 |
| 1994 | $55,462.59 |
| 1995 | $64,457.28 |
| 1996 | $65,097.98 |
| 1997 | $38,904.82 |

| TOTAL | $441,845.75 |
|-------|-------------|

Interest has accrued and shall continue to accrue on this adjudged liability on and after February 1, 2015, as specified in 26 U.S.C. §§ 6601, 6621-6622, 28 U.S.C. § 1961(c), along with all other statutory additions.

2.      The Triple S Family Trust dissolved when Genevieve Sanders passed away, and Frankie Sanders is the sole owner of the "Fayette farm," located at RR 1, Box 136, Ramsey, Illinois, Fayette County, and more specifically described as follows:

The West Half of the Northwest Quarter of Section 27, Township 9 North, Range 1 West of the Third Principal Meridian, in Fayette County, Illinois, excepting all coal underlying the same.

The Northwest Quarter (NW 1/4) of the Southwest Quarter (SW 1/4) of Section Twenty-seven (27) and the Northeast Quarter (NE 1/4) of be Southeast Quarter (SE 1/4) of Section Twenty-eight (28), all in Township Nine (9) North, Range One (1) West of the Third Principal Meridian, in Fayette County, Illinois, excepting all the coal below the depth of 125 feet beneath the surface, situated in Fayette County, Illinois.

3.      The Y&K Leasing Trust is Frankie Sanders's nominee with regard to the Montgomery farm, and he is the sole owner of the farm, more specifically described as follows:

The Southeast Quarter (SE 1/4) of the Northeast Quarter (NE 1/4) of Section One (1) the East Half (E 1/2) of the Northeast Quarter (NE 1/4) of the Southwest Quarter (SW 1/4) of Section One (1); and the Southeast Quarter (SE 1/4) of Section One (1) in Township Nine (9) North, Range Two (2) West of the Third Principle Meridian (3rd P.M.), Except all coal underlying said premises as hereto for conveyed, subject to all public and private roadways or easements as now located, situated in the Township of Witt, Montgomery County, Illinois.

Excluding the South Half (S 1/2) of the Southeast Quarter (SE 1/4) of the Southeast Quarter (SE 1/4) of the Southeast Quarter (SE 1/4) all in Section

One (1), Township Nine (9) North, Range two (2) West of the Third Principal Meridian, situated in Montgomery County, Illinois.

4.     Under 26 U.S.C. §§ 6321-22, the amounts due, described above, constitute liens in favor of the United States upon all property and rights to property belonging to Frankie Sanders, including the Fayette farm and the Montgomery farm.

5.     The federal tax liens upon the described real estate shall be enforced by sale of said property free and clear of all rights, claims, titles, liens, and interests of the parties, with the proceeds of sale to be distributed according to law.

6.     The United States shall promptly file a motion and proposed order setting forth with particularity the sale procedure and distribution priorities for the described real estate.

**7.**     Under Federal Rule of Civil Procedure 54(b), judgment is final for purposes of appeal as to above paragraphs 1 through 5, because there is no just reason to delay entry of final judgment on this portion of the case pending sale of the described real estate. The Clerk of Court is **DIRECTED** to enter judgment under Rule 54(b) of the Federal Rules of Civil Procedure in favor of the United States against Frankie Sanders in the amount of $441,845.75 plus interest, penalties, and other statutory additions that continue to accrue on this adjudged liability on and after February 1, 2015.

**IT IS SO ORDERED.**

**DATED:  February 18, 2016**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**